UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE LANDS COUNCIL, a Washington nonprofit corporation, WILDWEST INSTITUTE, a Montana nonprofit corporation., | ) ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| RANOTTA K. McNAIR, Forest Supervisor for the Idaho Panhandle National Forests; and U.S. FOREST SERVICE, an agency of the United States, | ) ) ) ) ) |
| Defendants. | ) ) |
| and | ) ) |
| BOUNDARY COUNTY, CITY OF BONNERS FERRY, CITY OF MOYIE SPRINGS, EVERHART LOGGING, INC., an Idaho corporation, and REGEHR LOGGING, INC., an Idaho corporation, | ) ) ) ) ) |
| | ) |
| Defendant-Intervenors. | ) ) |

CASE No. CV06-0425-N-EJL

**MEMORANDUM ORDER**

Pending before the Court in the above-entitled matter are the parties' cross motions for summary judgment.  The parties have submitted briefing on the motions and the matters are now ripe for the Court's review.  Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record.

Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this motion shall be decided on the record before this Court without oral argument.  Local Rule 7.1.

## Factual and Procedural History

On October 19, 2006, Plaintiffs, the Lands Council and Wildwest Institute, filed the complaint in this action alleging the Defendants, Ranotta K. McNair and the United States Forest Service ("USFS"), violated the provisions of the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and the Administrative Procedures Act ("APA") in approving the Mission Bush Restoration Project ("the Project").[1] The USFS issued a Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") in May of 2004 approving the Project.  Thereafter, the Ninth Circuit issued its decision in Lands Council v. Powell, 395 F.3d 1019 (9th Cir. 2005), which prompted the USFS to prepare a Supplemental EIS for the Project.  After a public comment period, the USFS issued the Supplemental Final EIS ("SFEIS") and new ROD on April 20, 2006.  (AR 00153, 00154).  Ranotta K. McNair signed and approved the April 20, 2006 ROD which selected a modified Alternative 2.  The selected Project alternative includes vegetation restoration treatments in 3,829 acres, fuels treatments on 3,698 acres, ecosystem burns

---

[1] The Court later granted a motion to intervene as Defendants in this matter to Boundary County, the City of Bonners Ferry, City of Moyie Springs, Everhart Logging, Inc., and Regehr Logging, Inc. (collectively "intervenors").  (Dkt. No. 20).  The intervenors have also filed a motion for summary judgment raising the same arguments as the USFS.  (Dkt. No. 76).

without harvest on 238 acres, reopening three miles of existing roads, construction of about two miles of new temporary roads, improvement to 39 miles of current system roads, and decommissioning of 13 miles of currently undriveable roads.  (AR 00153, SFEIS, p. 2679). The Project will result in removal of 23.5 million board feet of timber.  The stated purpose of the Project includes four primary considerations – vegetation, aquatics, wildlife habitat, and recreation.  (AR 00153, SFEIS, p. 2668; AR 00154, p. 2).  Plaintiffs challenge the USFS' compliance with the regulations regarding cumulative impacts, old growth forest standards, and species viability and habitat for old-growth dependent species.  USFS maintains that the projects were approved after careful consideration of all the applicable legal requirements.

With the Project's logging operations scheduled to begin in December of 2006, Plaintiffs also filed a motion for temporary restraining order and/or preliminary injunction. The parties submitted a joint briefing schedule on the preliminary injunction motion and the temporary restraining order was deemed moot.  (Dkt. No. 6).  The USFS then filed a notice indicating the logging would commence shortly, prompting the Plaintiffs to renew their motion for a temporary restraining order.   This Court considered the parties submissions and, on December 18, 2006, denied the Plaintiffs' motion for preliminary injunction.  (Dkt. No. 30).

Plaintiffs appealed the Order denying preliminary injunction.  On July 10, 2007, the Ninth Circuit entered a judgment reversing and remanding this Court's Order denying preliminary injunction.  (Dkt. No. 59); Lands Council v. McNair, 494 F.3d 771 (9th Cir. 2007).  The Defendants sought en banc review by the Ninth Circuit which was granted.  On

MEMORANDUM ORDER - 3

July 2, 2008, the en banc panel vacated its prior decision and affirmed this Court's denial of the motion for preliminary injunction. <u>Lands Council v. McNair</u>, 537 F.3d 981 (9th Cir. 2008) (en banc) ("<u>Lands Council</u>"). While the preliminary injunction motion was being decided, the parties filed their cross motions for summary judgment and completed their briefing on those motions which are now before the Court. (Dkt. Nos. 71, 73, 76).

<b>Standard of Law</b>

I.    <u>Summary Judgment</u>:

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. <u>Summers v. A. Teichert & Son, Inc.</u>, 127 F.3d 1150, 1152 (9th Cir. 1997). Federal Rule of Civil Procedure 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund, 882 F.2d 371, 374 (9th Cir. 1989) (citation omitted).  Of course, when applying the above standard, the court must view all of the evidence in a light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Hughes v. United States, 953 F.2d 531, 541 (9th Cir. 1992).

II.     Administrative Review:

The claims here are brought under NEPA and NFMA.  Claims brought under NEPA and NFMA are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.  See Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1114 n.14 (9th Cir. 2002); Wetlands Action Network v. U.S. Army Corps of Eng'rs, 222 F.3d 1105, 1114 (9th Cir. 2000).  Under the APA, the standard for reversing agency action requires the Court to find the agency acted in a manner that was "arbitrary, capricious, and abuse of discretion or otherwise not in accordance with the law."  5 U.S.C. §  760(2)(A); see Greenpeace Action v. Franklin, 14 F.3d 1324, 1331 (9th Cir. 1992); Nevada Land Action Ass'n v. United States Forest Service, 8 F.3d 713, 716 (9th Cir. 1993).  An agency decision is arbitrary or capricious if:  1) the agency offered an explanation for its decision that was counter to the evidence before it; 2) the agency relied on factors that Congress did not intend for it to consider; 3) the agency entirely failed to consider an important aspect of the issue; or 4) the agency's decision is so implausible that it could not be ascribed to the product of agency expertise.  See Lands Council, 537 F.3d at 987 (citations omitted).

The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency.   MotorVehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983).  The agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." Id. (citing Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  In reviewing that explanation, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."   Id. (citing Bowman Transp. Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 285 (1975); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971)).

The Ninth Circuit's en banc decision in this case, Lands Council v. McNair, 537 F.3d 981 (9th Cir.2008) (en banc), provided clear direction that this Court takes to heart in reviewing the USFS' decisions.[2]  We do not "act as a panel of scientists that instructs the Forest Service how to validate its hypotheses regarding wildlife viability, chooses among scientific studies in determining whether the Forest Service has complied with the underlying Forest Plan, and orders the agency to explain every possible scientific uncertainty."   Id. at 988.  Rather, what is requires is

---

[2]  The Court is aware that a subsequent Ninth Circuit decision did not necessarily followed the direction of the Lands Council en banc opinion.  See Center for Biological Diversity v. United States Dept. of Interior, ___ F.3d ___, 2009 WL 2914504 (9th Cir. Sept. 14, 2009) Tallman dissenting.  The en banc decision, however, is the law of this case.  As such, this Court will follow the directive from the en banc panel of the Ninth Circuit in this case.  The Court also acknowledges the Plaintiffs' argument that the Ninth Circuit decision was reviewing the record only as to the arguments raised on appeal as to the preliminary injunction motion.  See Lands Council, 537 F.3d at 988 n. 4. This Court has now undertaken a more detailed review of the record as appropriate at the motion for summary judgment phase.

that the Forest Service ... support its conclusions that a project meets the requirements of the NFMA and relevant Forest Plan with studies that the agency, in its expertise, deems reliable.  The Forest Service must explain the conclusions it has drawn from its chosen methodology, and the reasons it considers the underlying evidence to be reliable.  We will conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan.

See WildWest Institute v. Bull, 547 F.3d 1162, 1171 n. 4 (9th Cir. 2008) (quoting Lands Council, 537 F.3d at 994).  Thus, in applying this standard, the Court grants substantial deference to the decisions and actions of federal agency defendants in adopting and implementing the certain agency activities.  Kettle Range Conservation Group v. United States Forest Service, 148 F.Supp.2d 1107 (E.D. Wash. 2001).  Accordingly, when an agency reaches a decision based on its expert review of the facts, a reviewing court should determine only whether the decision was "arbitrary or capricious."  Id. (citing Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989)).  In other words, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment.'"  Id. (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).  "Within this narrow review, [the court] cannot substitute [its] judgment for that of the [agency], but instead must uphold the agency decisions so long as the agencies have 'considered the relevant factors and articulated a rational connection between the facts found and the choice made."  Selkirk Conservation

MEMORANDUM ORDER - 7

Alliance v. Forsgren, 336 F.3d 944, 953-54 (9th Cir. 2003) (quoting Washington Crab
Producers, Inc. v. Mosbacher, 924 F.2d 1438, 1441 (9th Cir. 1990)).

### Discussion

The Mission Bush Project is located in the Bonners Ferry Ranger District in northern
Idaho and extends into Mission Creek drainage area in Canada.  The project "assessment area
encompasses the Mission and Brush Creek watersheds - totaling about 31, 350 acres.
Approximately 16,550 acres are National Forest lands on the Bonners Ferry Ranger District,
7490 acres are private land, and 7300 acres lie in Canada."  (AR 00153, SFEIS, p. 2668).
The Project area is "home to a variety of species (or their habitats), including the northern
gray wolf, Canada lynx, grizzly bear, black-baked woodpecker, flammulated owl, fisher,
western toad, pileated woodpecker, and the whit-tailed deer" as well as old-growth trees.
Lands Council, 537 F.3d at 984.  The Project is proposed, in part, "to restore the forest to its
historic composition, which, in the Forest Services assessment, is more likely to be
sustainable over time."  Id. at 985.  "[T]he overall 'objectives of the project are to begin
restoring forest health and wildlife habitat improv[e] water quality and overall public aquatic
habitat by reducing sediment and the risk of sediment reaching streams, and provid[e]
recreation opportunities that meet the varied desires of the public and the agency while
reducing negative effects to the ecosystem."  Id. (quoting AR 00153, SFEIS).  Plaintiffs
challenge the USFS' approval of the Project violates various statutes and regulations which
the Court will take up in turn.

MEMORANDUM ORDER - 8

I.      Violation of IPNF Plan and NFMA Standards for 10 Percent Minimum Old Growth

     A.      Standards

         1.      National Forest Management Act Standard

"NFMA imposes both substantive and procedural requirements on the Forest Service...to develop a land and resource management plan ("forest plan")...[and] agency actions must not only comply with NFMA but also be consistent with the governing forest plan."  Ecology Center, Inc. v. Austin, 430 F.3d 1057, 1062 (9th Cir. 2005) (citations omitted); see also 16 U.S.C. §§ 1604(a), (i).  As explained by the Ninth Circuit:

> The NFMA sets forth the statutory framework and specifies the procedural and substantive requirements under which the Forest Service is to manage National Forest System lands. Procedurally, the NFMA requires the Forest Service to develop a forest plan for each unit of the National Forest System. 16 U.S.C. § 1604(a). In developing and maintaining each plan, the Forest Service is required to use "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences." Id. § 1604(b). After a forest plan is developed, all subsequent agency action, including site-specific plans ... must comply with the NFMA and be consistent with the governing forest plan. Id. § 1604(i).

Greater Yellowstone Coalition v. Larson, ___ F.Supp.2d ___, 2009 WL 2424100 (D. Idaho 2009) (quoting Lands Council, 537 F.3d at 988-89); see also Powell, 395 F.3d at 1033 ( "once the Forest Plan is adopted, NFMA prohibits any site-specific activities that are inconsistent with the Forest Plan" and NFMA's requirements.") (citing Inland Empire Pub. Lands Council v. United States Forest Service, 88 F.3d 754, 757 (9th Cir. 1996)).

MEMORANDUM ORDER - 9

2.    Idaho Panhandle National Forest Plan

"The 1987 Idaho Panhandle National Forest (IPNF), Forest Plan, Standard 10b. calls for maintaining '10% of the forested portion of the IPNF as old growth.' The Forest Plan identified 2,310,000 forested acres on the IPNF. Therefore, the Forest Plan requires maintaining 231,000 acres of old growth. Forest Plan Standard 10a. incorporates the definitions of old growth developed by the Regional Old Growth Task Force...." (AR 00173, p. 3922; AR 00722, II-29). "The Plan's minimum requirement for old growth forest is important, both because these forests maintain our connection to a bygone age and because their well-being is necessary for the survival of many species." Powell, 395 F.3d at 1035-36.

B.    Analysis

Relying on the decision in Powell, the Plaintiffs argue the 10 percent IPNF Plan minimum requirement for old growth is not met in the IPNF and, therefore, the USFS cannot log any old growth. (Dkt. No. 71, pp. 19-22; Dkt. No. 79, p. 12). Thus, Plaintiffs assert the Project violates IPNF and NFMA by allowing the logging of 277 acres of old growth habitat. (Dkt. No. 71, pp. 19-22). The USFS employed two separate, independent tools to monitor old growth in the IPNF:  the Forest Inventory and Analysis and the Timber Stand Management Record System. (AR 00153, SFEIS, pp. 2786, 2862; 00166; 00170; 00173, p. 3922). The USFS argues these databases are reliable, pointing to the Ninth Circuit's en banc decision on preliminary injunction in this case, the site specific validity examinations of units updating and affirming the habitat models (AR 00153, SFEIS, pp. 2896-2900), and the published scientific studies upon which the models are based. (AR 00166, pp. 3823-29,

5217; 00170, pp. 3853-56; 00171, pp. 3857-59).  Thus, the USFS maintains that the TSMRS

and FIA databases support its finding that the 10 percent minimum requirement by the IPNF

Plan is met.

        1.    <u>Forest Inventory and Analysis ("FIA") database</u>

Plaintiffs argue the FIA database is unreliable because it uses spot surveys from a

limited number of plots which, in the fragmented IPNF, are not accurate and do not meet the

IPNF Plan's minimum 25 acre old growth size requirement.  (Dkt. No. 71, p. 21).  Plaintiffs

further question the reliability of the FIA database because the monitoring reports reflect a

10 percent reduction in the old growth percentage in two years, undermining the 90 percent

confidence level.  (Dkt. No. 71, p. 21); <u>see also</u> (AR 00173, p. 3923 (finding 10.55 percent

-15.27 percent old growth in 2004) and (AR 00166, pp. 3828-29 (finding 9.5 percent -14

percent old growth in 2006)).  As such, Plaintiffs contend the FIA is inaccurate and cannot

be used to confirm the reliability of the TSMRS database as argued by the USFS.  On the

other hand, the USFS contends the reliability of the FIA is demonstrated by the fact that it

is   independently   conducted,   publicly   disclosed,   and   supporting   materials   in   the

administrative record.

In reviewing the administrative record, the Court finds the USFS did not act arbitrarily

or capricious in using the FIA as a basis for its conclusions.  The FIA utilizes sample design

and data collection standards that are strictly controlled, scientific, publicly disclosed,

repeatable, and unbiased.  (AR 00173, pp. 66-67) ("Using FIA data to assess the percent of

old growth allows us to base our monitoring on an unbiased, statistically sound,

MEMORANDUM ORDER - 11

independently designed and implemented representative sample of forest conditions" in the IPNF.); (AR 00166).  Plaintiffs allege the FIA is unreliable because its spot surveys were smaller than 25 acres.  Plaintiffs contend the IPNF Plan 10f. establishes a minimum stand size of 25 acres before old growth can be considered suitable habitat for old growth species. (Dkt. No. 71, p. 20).  The IPNF Plan 10f. states:

> One or more old-growth stands per old-growth unit should be 300 acres or larger.  Preference should be given to a contiguous stand; however, the stand may be subdivided into the stands of 100 acres or larger if the stands are within one mile.  The remaining old-growth management stands should be at least 25 acres in size.  Preferred size is 80 plus acres.

(AR 00722, II-29).  The Plaintiffs' argument is misplaced.  The IPNF Plan 10f. reflects the plan's preference for larger old growth stands, not a minimum size requirement for old growth stands.  Further, the SFEIS addresses the issue of stand size noting seven stands within the Project area that are less than 25 acres are within a quarter-mile from other larger patches of old growth and, even without these stands, the IPNF Plan 10 percent requirement is met.  (AR 00153, SFEIS, p. 2863); (Dkt. No. 73, p. 15).

The FIA determined that "old growth is well distributed across the IPNF," estimating the percent of old growth on the forested lands of the IPNF at approximately 12 percent with a 90 percent confidence interval, yielding an estimated range of approximately 10 to 14 percent.  (AR 00173, p. 3923 (10.55 percent -15.27 percent old growth in 2004) and (AR 00166, pp. 3828-29 (9.5 percent -14 percent old growth in 2006)).  The Court finds the Plaintiffs' challenge to the 90 percent confidence rating because of the disparity between the

MEMORANDUM ORDER - 12

years 2004 and 2006 to be unsupported and unpersuasive.  The slight percentage variation

between the years 2004 and 2006 does not render the FIA unreliable.  The FIA model is well

documented, independent, public, and its findings are supported by other scientific materials

in the administrative record.  Moreover, the Court affords the USFS an appropriate amount

of deference when, as here, it reaches its decision based on its experts' review of the facts,

has considered the relevant factors, and has articulated its reasoning.  See Lands Council, 537

F.3d at 993 (we are required " to defer to an agency's determination in an area involving a

'high level  of technical expertise.'") (citation omitted).  The Court finds the USFS has

conducted a reasonable inquiry in reaching its decision and there was no clear error in

judgment in utilizing the FIA.

> 2.   The Timber Stand Management Record System ("TSMRS") database

The TSMRS database was also used by the USFS to monitor old growth in the IPNF.

Plaintiffs argue the TSMRS database is unreliable, pointing to the 2005 Powell decision

where, based on the facts in that case, the Ninth Circuit found the TSMRS to be unreliable.

(Dkt. No. 71, p. 15).  Based on that decision, Plaintiffs argue they have met their burden to

show the TSMRS here is unreliable and that the burden is now upon the USFS to show its

data is reliable.  (Dkt. No. 79, pp. 9, 12).  The USFS counters that unlike in the Powell case,

here it has undertaken site surveys to update the TSMRS database and materials.  To that

end, the USFS has expended over $320,000 in reviews and updates of old growth stand

information in the TSMRS database.  (AR 00173, p. 70).  The Plaintiffs reply that merely

expending a large amount of money does not prove the material is reliable.

MEMORANDUM ORDER - 13

The Court finds the USFS acted appropriately in considering the TSMRS' conclusion as to the percentage of old growth in the IPNF.  This finding is not based simply on the amount of money recently spent updating the database.  (AR 00173).  Instead, the Court's decision is focused on the substance of those updates, the TSMRS modeling, and the supporting materials in the administrative record.  (AR 00153, SFEIS, p. 2688; 00173, p. 5).  The USFS completed the SFEIS specifically for the purpose of updating its data regarding old growth in the Project area because of the Powell decision.  (AR 00153, SFEIS, pp. 2688, 2786, 2861).  The TSMRS database was updated using the new field studies verifying old growth quantities in the Project area.  (AR 00153, pp. 2688, 2786).  There is no categorical requirement for the agency to conduct such an on-the-ground analysis.  Lands Council, 537 F.3d at 991.  Here, however, the USFS engaged in field studies to update its data and assure itself that the data it was relying upon was accurate and timely.  Id.  ("The Forest Service is at liberty, of course, to use on-the-ground analysis if it deems it appropriate or necessary, but it is not required o do so.").  Based on the new data, the TSMRS database concluded that 12.1 percent of the IPNF forested acres are allocated old growth with 98.5 percent of these stands having been field verified.  (AR 00173, p. 3927).  The SFEIS concluded that the IPNF requirements for old growth were met.  (AR 00153, SFEIS, p. 2862).

In reaching this conclusion, the USFS discussed the methodologies used to inventory and monitor old growth (AR 00153, SFEIS, p. 2786) such that it is apparent that the models utilized reliable data in arriving at its conclusions.  The administrative record further supports this conclusion with several current reports and analysis which support the USFS'

conclusions regarding the impact of the proposed project on the old growth stands in the area. (See e.g., AR 00164 - 00167). As such, the Court finds the USFS' use of the TSMRS data base was not arbitrary or capricious.

3.   <u>Consideration of Other Materials</u>

In disputing the USFS' conclusion that the 10 percent minimum exists in the IPNF, Plaintiffs point to the 2005 study the Lands Council conducted which concluded that "approximately 70 percent of the FS-designated 'old growth' stands did not meet the Forest Service's own minimum criteria for old growth." (Dkt. No. 71, p. 20) (citing AR 00709, "Lost Forests: An Investigative Report on the Old growth of IPNF" by Ellen Picken). The USFS, however, did consider the "Lost Forests" report relied upon by the Plaintiffs. (Dkt. No. 71, p. 20); <u>see also</u> (AR 00166). The Lost Forests report does not disclose the statistical sample design or data upon which it is based. (AR 00166, p. 3823). The USFS' expert seriously questioned the reliability and credibility of the report. (AR 00166). The USFS is afforded discretion to rely upon the reasonable opinion of its own experts where other contrary views have been presented. <u>See</u> <u>Lands Council</u>, 537 F.3d at 1000 (quoting <u>Marsh</u>, 490 U.S. at 378). The Court finds the USFS gave proper consideration to the materials available to it in reaching this decision, including those materials that raised questions about the proposed action such as the "Lost Forests" report. As such, the USFS did not act arbitrarily or capriciously, complied with the requirements of NFMA, and did not clearly error in relying on the opinions' of its experts reaching its conclusions regarding the Project.

MEMORANDUM ORDER - 15

4.   Conclusion

In sum, the Court finds the USFS' reliance upon these two databases was not arbitrary and capricious.  The TSMRS and FIA databases are independent monitoring tools that the USFS employed to determine the percentage of old growth in the IPNF.  Because the databases utilize distinct models and are administered by different people, it is telling that the estimates of the percentage of old growth in the IPNF is approximately 12 percent in both the FIA and TSMRS.  (AR 00153, SFEIS, p. 2786; 00166).   The models corroborate one another and support the USFS' position that the Project is in accordance with the IPNF requirement to maintain 10 percent minimum old growth.  (AR 00166).  Further, the USFS' updates of its data regarding old growth in the project lend weight to the reliability of the models as well as their conclusions that IPNF Plan requirements for old growth are satisfied.  (AR 00153, SFEIS, pp. 2688, 2786, 2861-62).  Because the Project actions will not result in a net loss of allocated old growth, the Project does not violate the "IPNF Plan's requirement to maintain ten percent of the forest acreage as old growth forest."  Powell, 395 F.3d at 1036; (AR 00153, SFEIS, p. 2862).

II.   The Project's Impact on Old Growth Habitat and Biological Diversity

A.   National Environmental Protection Act Standard

"NEPA was passed by Congress to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action."  Powell, 395 F.3d at 1026.  Unlike NFMA, NEPA does not impose substantive requirements but is

MEMORANDUM ORDER - 16

"designed to force agencies to publicly consider the environmental impacts of their actions before going forward." Ecology Center, Inc. v. Austin, 430 F.3d 1057, 1062 (9th Cir. 2005) (citations and quotations omitted). "NEPA aims to make certain that 'the agency...will have available, and will carefully consider, detailed information concerning significant environmental impacts,' and 'that the relevant information will be made available to the larger [public] audience." Lands Council, 537 F.3d at 1000 (citation omitted). "In order to accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." Lands Council, 537 F.3d at 1027 (citing Earth Island Inst. v. United States Forest Serv., 351 F.3d 1291, 1300 (9th Cir. 2003)).

To that end, "[f]or any proposed major federal action...NEPA requires the agency to prepare an Environmental Impact Statement." Id. at 1026. The Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA ("CEQ Regulations") that require a federal agency to adequately consider, analyze, and disclose the individual and cumulative environmental impacts of the proposed action and alternatives to it when preparing an EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.16. "NEPA requires that the [EIS] contain high-quality information and accurate scientific analysis. If there is incomplete or unavailable relevant data, the [EIS] must disclose this fact." Powell, 395 F.3d at 1031 (citing 40 C.F.R. §§ 1500.1(b), 1502.22). The USFS need not affirmatively present every uncertainty in the EIS but it "must acknowledge and respond to comments by outside parties that raise significant scientific uncertainties and reasonably support that such uncertainties exist." Lands Council, 537 F.3d at 1001. "[W]hen the Forest Service provides a full and fair

MEMORANDUM ORDER - 17

discussion of environmental impacts and  its EIS includes [the] necessary components, the

Forest Service has taken the requisite 'hard look.'"  Lands Council, 537 F.3d at 1001.

The agency must also analyze a proposed projects cumulative impact in light of the

effects of past, current, and reasonably foreseeable future projects.  Powell, 395 F.3d at 1027.

A "cumulative impact" under NEPA means "the impact on the environment which results

from the incremental impact of the action when added to other past, present, and reasonably

foreseeable future actions regardless of what agency (Federal or non-Federal) or person

undertakes such other actions."  40 C.F.R. § 1508.7.  Cumulative impacts "can result from

individually minor but collectively significant actions taking place over a period of time."  Id.

In order for the agency to "consider" cumulative effects, "some quantified or detailed

information is required," since, without it, "neither the courts nor the public, in reviewing the

Forest Service's decisions, can be assured that the Forest Service provided the hard look that

it is required to provide."  Neighbors of Cuddy Mountain v. United States Forest Service, 137

F.3d 1372, 1379 (9th Cir. 1998).  General statements about "possible" effects and "some risk"

are generally insufficient, and it is not appropriate for the agency "to defer consideration of

cumulative impacts to a future date."  Id. at 1380.  The Ninth Circuit Court of Appeals

recently expounded on and reinforced these principles in Powell, 395 F.3d at 1027.  As

previously noted, this decision prompted the USFS to compile the SFEIS in order to assure

it had complied with the cumulative impacts analysis requirement.  (AR 00153, SFEIS,

Abstract 1-5, Appendix A-4, 29).

MEMORANDUM ORDER - 18

B.     Analysis

The Project, Plaintiffs assert, will result in "the logging of hundreds of acres of potential replacement old growth habitat."  Plaintiffs argue the USFS has not taken the requisite hard look at the impacts of the Project's logging on old growth habitat and biological diversity.  (Dkt. No. 71, p. 7).  Plaintiffs argue the USFS failed to consider the Project's cumulative effects on the habitat resulting from the fragmentation, potential replacement of old growth, the increase in opening size, and the historical logging in the area.  (Dkt. No. 79, p. 8, n. 2).  Plaintiffs also contend the USFS failed to consider and properly disclose to the public the differing opinions regarding management of old growth forests.  (Dkt. No. 71, p. 8).  USFS counter that the IPNF Plan standard for old growth is met, there will be no net loss of old growth, the current forest conditions show mature forests are in abundance, and they did consider the cumulative impacts of the Project on the old growth habitat and species as required by NEPA.

1.     Forest Openings and Habitat Fragmentation

Plaintiffs argue the USFS failed to consider and disclose the Project's impact on the average opening size, increased habitat fragmentation, snag habitat, and canopy closure in the old growth stands. (Dkt. No. 79, p. 8-9).  The SFEIS, however, does discuss forest opening size, concluding the opening size is currently decreasing compared to historic opening sizes. (AR 00153, SFEIS, p. 2785; AR 00167, pp. 3831-33).  The Project is designed to create fewer but larger openings in order to achieve more historic and sustainable forest structure; larger opening size reduces fragmentation and edge effect that results from smaller but more

MEMORANDUM ORDER - 19

numerous openings.  (AR 00153, SFEIS, p. 2669). SFEIS also discussed canopy closure (AR 00153, SFEIS).  As covered later in this Order, the Projects impact on species viability and habitat is discussed throughout the SFEIS.  The administrative record, and in particular the SFEIS, demonstrate the USFS has taken the requisite hard look at the Projects impact on forest fragmentation, openings, habitat, and canopy closure in old growth stands.

        2.        <u>Past Logging in the Project Area and Potential Replacement Old Growth</u>

Plaintiffs challenge that the USFS failed to account for the past 30 years of repeated logging in the Project area that has negatively impacted the old growth.  (Dkt. No. 71, pp. 9, 16-17).  Plaintiffs dispute the USFS' decision that allowing the logging of "six square miles of forest" will improve habitat because the area has been repeatedly logged for the same purpose for the last thirty years, which has not resulted in improved old growth habitat.  (Dkt. No. 71, p. 9).  Plaintiffs question how, given the past logging, the USFS could conclude that additional logging would somehow benefit the old growth stands and the species that rely upon them.  (Dkt. No. 71, p. 17).  USFS maintains that it considered the historical logging in the Project area and contends the purpose of the previous logging was economic whereas the Projects' purposes are to restore historical vegetation conditions of the area.  (AR 00153, SFEIS, p. 2771).

        a.        <u>History of the Project Area</u>

Upon a review of the SFEIS, the Court finds the USFS considered and analyzed the past and foreseeable future logging projects and the impact of those projects on the environment in the Project area.  (AR 00153, SFEIS, pp. 2758, 2764, 2859, 2879, Appendix

A-4); see Powell, 395 F.3d at 1027-29.  The SFEIS also discusses the impact of past

regenerations since the inception of the IPNF Plan.  (AR 00153, SFEIS, p. 2863).  The SFEIS

further addresses the  private lands in the Project area which are subject to future timber

operations.  (AR 00153, SFEIS, p. 2883).  The administrative record also contains material

discussing the past impacts of fire in the region.  (AR 00177, 179, 180).  As such, the Court

finds the USFS took a hard look at the past impacts on the Project area, including previous

logging and fire suppression efforts as evidenced in the SFEIS.  (AR 00153, SFEIS, p. 2676).

>           b.       The Project's Purpose

As to the purpose of the Project, Plaintiffs couch the proposed treatment methods as

"logging," because they will result in the removal of trees.  This argument, however, takes the

Project's proposed actions out of context.  Although trees will be removed under the Project,

the Project's purpose is not logging of old growth.  (AR 00153, SFEIS, p. 2862).  The Project

proposes to treat dry forest old growth by employing restoration cutting of smaller diameter

trees to reduce the density of stands, reducing the threat of wildfire and disease, and create

stand conditions favoring certain desired tree species and size classes.  (AR 00153, SFEIS,

pp. 2676, 2765).  The treatments prescribed by the Project will include harvesting of trees

contained within old growth stands in order to achieve a more historical and sustainable old

growth stand.  (AR 00153, SFEIS, pp. 2861, 2861).  These treatments are designed to increase

and maintain existing old growth stands and "allocating additional stands for future old

growth as they mature."  (AR 00153, SFEIS); Lands Council, 537 F.3d at 986.  The objective

is to "restore and sustain the old growth by retaining the large old trees, preserving the old

MEMORANDUM ORDER - 21

growth characteristics, and restoring historic old growth structures and processes." (AR 00153, SFEIS, p. 2762). Such harvesting will not result in the net loss of allocated old growth. Lands Council, 537 F.3d at 986. As such, the Court finds the Project is not being sought for the same purpose as the past logging projects.

3.    Old Growth Management

Plaintiffs argue the USFS failed to consider the cumulative impacts of the Project, potential future replacement old growth habitat, and alternative management options including taking no action. USFS argues it properly considered and analyzed the cumulative impacts of the Project on mature forests and analyzed the various management options, including the no action alternative, before arriving at its decision. (Dkt. No. 73, p. 16) (AR 00153, SFEIS, pp. 2863-64).

"NEPA requires that the [EIS] contain high-quality information and accurate scientific analysis. If there is incomplete or unavailable relevant data, the [EIS] must disclose this fact." Powell, 395 F.3d at 1031 (citing 40 C.F.R. §§ 1500.1(b), 1502.22). Plaintiffs argue the USFS failed to consider a 1983 Forest Plan EIS which supports their proposed old growth management conclusions that old growth should not be treated. (Dkt. No. 71, p. 8, n. 1). The 1983 report states "[o]ld growth stands once designated should be left alone. Thinning is detrimental to old growth." (AR 00722, App. 28). The USFS, however, disputes the applicability of the 1983 document as it refers to moist site old growth douglas fir forest whereas the Project area involves dry site ponderosa pine forests. (Dkt. No. 80, pp. 3-4). The USFS maintains in the Project area "the science is clear" that the silvicultural treatments

MEMORANDUM ORDER - 22

proposed to thin younger trees and retain the mature tree stands is an appropriate management

tool for the Project area.  (Dkt. No. 80, p. 4).

The Court finds the proposed Project silvicultural treatments are not "logging," as the

Plaintiffs contend, but are instead appropriate old growth management.  The USFS'

conclusion has scientific support in the administrative record.  (AR 00153, SFEIS, pp. 2836,

2861; 00175, 00181, 00184). The SFEIS acknowledges the no action management view

advanced by Plaintiffs but also contains analysis of the scientific literature supporting the

Project's proposed management treatments.  (AR 00153, SFEIS, pp. 2852-53, 2861, 3020,

Appendix F-3).  The literature contained in the administrative record and relied upon by the

USFS discusses the results obtained by past restoration treatments.  (AR 00181, 00184).

While the literature appears to conclude that restoration practices can be beneficial, it

recognizes that there is some debate about how to undertake forest restoration and that in all

cases site-specific research is necessary before determining how to pursue restoration.  (AR

00184).  The USFS properly considered the relevant materials regarding the varying options

for forest management, including those provided by Plaintiffs, and compiled site-specific data

before arriving at a reasoned decision as to the chosen alternative.

The SFEIS considered and concluded that taking no action would result in a drop in

old growth and mature forests. (AR 00153, SFEIS, p. 2841).  The Court finds the scientific

materials relied upon by the USFS are more applicable to the Project as they analyze the

historical condition of dry site old growth forests which is the type of forest in the Project

area.  (AR 00153, SFEIS, pp. 2674, 2692, 2852-53, 2861, 2818, 3020, Appendix F-3).

MEMORANDUM ORDER - 23

Further, the document relied upon by the Plaintiffs is twenty-five years old as opposed to the more recent scientific materials cited by the USFS to support the proposed treatments.  (AR 00184).

The Court defers to the USFS' expertise on the question involving the management of the forest.  Where the agency is "making predictions, within its [area of] special expertise, at the frontiers of science" we are to be "most deferential."  Lands Council, 537 F.3d at 993 (citation omitted).  Such deference is afforded to the agency's judgment within their field of discretion and expertise "as long as they are reasonable."  Id. (citations omitted).  Further, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."  Id. at 1000 (citing Marsh, 490 U.S. at 378).

The Court finds the USFS' decision to manage the area by way of various treatment methods, including some partial harvesting of trees, to be rational, reasonable, and in accordance with NEPA.  (AR 00175, 00179, 00181).  The USFS considered and analyzed the proper management of old growth forests of the type found in the Project area in arriving at its conclusions regarding appropriate treatments to achieve the Project goals of restoring and creating healthier old growth stands.  (AR 00153, SFEIS, pp. 2861-62; 00175, 00177, 00179, 00180, 00182).  In addition, the USFS discussed the methodologies used to inventory and monitor old growth (AR 00153, SFEIS, p. 2786) such that it is apparent that it took a hard look at reliable data in arriving at its conclusions.  The administrative record contains several current reports and analysis which support the conclusions reached by the USFS regarding

MEMORANDUM ORDER - 24

the impact of the proposed project on the old growth stands in the area.  (See e.g., AR 00164 -

00167).  Because the Project meets the IPNF Plan standard for old growth, designation of

replacement old growth is unnecessary to satisfy the IPNF Plan.  Moreover, the SFEIS

concluded that mature forests are in abundance in the IPNF and analyzed the impacts of the

Project on the mature forests in light of the cumulative effects associated with past activities.

(AR 00153, SFEIS, pp. 2785, 2863-64).  The USFS took a hard look at the different forest

management options' impact on old growth, fragmentation, and biological diversity.  (AR

00153, SFEIS, p. 2676).

III.     The Project's Impact on Old Growth Species Habitat and Viability

         A.     Standards

         Under NFMA the USFS must "specify[] guidelines for land management plans

developed to achieve the goals of the Program which ...provide for diversity of plant and

animal communities based on the suitability and capability of the specific land area in order

to meet overall multiple-use objectives, and within the multiple-use objectives of a land

management plan adopted pursuant to this section, provide, where appropriate, to the degree

practicable, for steps to be taken to preserve the diversity of tree species similar to that

existing in the region controlled by the plan...."16 U.S.C. § 1604(g)(3)(B).  The IPNF Plan

requires the USFS to "[m]anage the habitat of species listed in the Regional Sensitive Species

List to prevent further declines in populations which could lead to federal listing under the

Endangered Species Act."  (AR 00722, IPNF Plan, II-28).

"NFMA requires that the Forest Service identify Indicator Species, monitor their population trends, and evaluate each project alternative in terms of the impact on both Indicator Species habitat and Indicator Species populations." Powell, 395 F.3d at 1036 (citing Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 971-74 (9th Cir. 2002)).   In satisfying this requirement, USFS may study population trends of the Indicator Species "by using Indicator Species habitat as a proxy for Indicator Species population trends in a so-called 'proxy on proxy' approach.  Crucial to this approach, however, is that the methodology for identifying the habitat proxy be sound." Powell, 395 F.3d at 1036 (citing Rittenhouse, supra.).  "The 'proxy on proxy' approach to studying MIS population trends operates on the assumption that as long as a species' habitat is maintained, the species will likewise be maintained.   Thus, analysis of trends in the species habitat is, in essence, an indirect measurement of the species population trends." Powell, 395 F.3d at 1036, n. 23.  "If the habitat trend data is flawed, the proxy on proxy result...will be equally flawed" in violation of NFMA's population monitoring requirement.  Id.

      B.    Proxy Methodology

The most important impacts upon sensitive species and MIS, Plaintiffs assert, is that "the IPNF lacks sufficient levels of old growth habitat upon which their survival depends." (Dkt. No. 71, p. 11).  Plaintiffs argue this Project violates IPNF Plan and NFMA in failing to manage for minimum viable populations of old growth species and argue the proxy on proxy approach is unreliable and insufficient to satisfy NFMA's requirements.  (Dkt. No. 71, pp. 11-12).  Plaintiffs contend the USFS "falls far short of analyzing and disclosing effects on old

growth species' viability, caused by the current conditions and by the Mission Brush timber sale." (Dkt. No. 71, p. 17). The USFS violates NFMA, they argue, by failing to account for the impact of past logging and fire suppression has had on old growth species habitat and viability in the Project area.

Plaintiffs challenge the USFS' use of the proxy on proxy approach is unreliable to support its conclusions; relying on the decision in <u>Powell</u> and the language of <u>Rittenhouse</u>. (Dkt. No. 71, pp. 13-14). In <u>Powell</u>, the Ninth Circuit determined the TSMRS database, Forest Service's main tool for old growth calculation, was inaccurate. <u>Powell</u>, 395 F.3d at 1036 (noting the data was fifteen years old, inaccurate as to the canopy closure estimates, and insufficient data on snags). There, the Ninth Circuit rejected the Forest Service's on-the-ground surveys as a solution for the TSMRS' shortcomings stating they "do not rehabilitate the proxy on proxy method, and, in this case, do not vindicate the Forest Service's reliance on the proxy on proxy method as a monitoring of population trends." <u>Id.</u> at 1037. The Plaintiffs reliance on <u>Powell</u>, however, is unpersuasive. <u>Powell</u> allows the proxy approach so long as the methodology is sound. The USFS undertook efforts subsequent to <u>Powell</u> in order to update its data and address the concerns raised in that case. The USFS' findings here are based on the new field studies, and the other materials contained in the administrative record, all of which were considered, discussed, and reasonably relied upon by the USFS in the SFEIS.

Moreover, the Ninth Circuit's en banc decision in this case approved the USFS' use of the amount of suitable habitat for a particular species as a proxy for the viability of that

MEMORANDUM ORDER - 27

species.  <u>Lands Council</u>, 537 F.3d at 996-98.  This Court too finds the USFS' use of habitat

as a proxy in this case is not arbitrary or capricious.  As stated above the USFS conducted

field studies to update its data.  Moreover, the USFS utilized a separate and independent

database, the FIA, that corroborates the TSMRS database's conclusions.  Having reviewed

the record in this matter, the Court finds the USFS has described the quantity and quality of

the habitat necessary to sustain the viability of the species, and explain its methodology for

measuring the habitat.  (AR 00153, SFEIS, p. 2813); <u>see</u> <u>Lands Council</u>, 537 F.3d at 998.  The

models, databases, and materials relied upon by the USFS are timely, reliable, and supported

by scientific reports.  As such, the Court finds no clear error of judgment in the USFS'

analysis.

       C.    <u>IPNF Old Growth Requirements</u>

     Plaintiffs again challenge the USFS' conclusion that the IPNF Plan's 10 percent old

growth standard is not met and go even further arguing that if the habitat proxy approach is

used by the USFS, it must then also meet the IPNF Plan's requirement of 40 percent minimum

viable population for species.  (Dkt. No. 71, p. 12-13).  Plaintiffs cite to the IPNF Plan's

requirement that "[h]abitat for vertebrate populations, other than threatened, endangered and

sensitive species, will be managed to maintain viable populations (greater than 40 percent of

maximum potential).  In order to maintain viable populations of all species, the habitat will

be managed for selected indicator species."  (Dkt. No. 71, p. 9) (quoting AR 00722, IPNF

Plan, II-5).  The IPNF Plan also requires, Plaintiffs argue, that the USFS "[m]aintain at least

minimum viable populations of management indicator species distributed throughout the

MEMORANDUM ORDER - 28

Forest." (Dkt. No. 71, p. 10) (quoting AR 00722, IPNF Plan, II-28). As such, Plaintiffs argue in order to satisfy the IPNF Plan, old growth must be at 40 percent of its historic level of 35 percent resulting in a minimum old growth percentage of 14; which the IPNF does not meet. (Dkt. No. 71, p. 9).

USFS disagrees that the IPNF requires 14 percent old growth habitat arguing that 1) the 40 percent requirement is an "objective" not a "standard" and, therefore is not mandatory or legally enforceable and 2) the 40 percent species population objective does not equate to a 40 percent historic old growth habitat requirement. Even if the resulting minimum standard were 14 percent, the USFS contends the applicable Project area meets the 14 percent requirement.

The Court rejects the Plaintiffs argument that the USFS is required to show a minimum old growth of 14 percent in the Project area. Just because it used the proxy habitat method, does not mean the USFS is now required to met a higher percentage of minimum old growth than expressly stated in the IPNF Plan's standards. As determined above, the use of the proxy habitat to monitor species in this case is reliable and reasonable. Further, the USFS was not arbitrary and capricious in concluding that the 10 percent requirement has been met in the IPNF. Because the IPNF Plan required minimum for old growth is met and the Project does not harvest any old growth, the Project does not violate the IPNF Plan. See Powell, 395 F.3d at 1036.

D.    Species Monitoring and Viability Compliance with NFMA

Plaintiffs challenge that the USFS has not properly or accurately analyzed the species'

viability and habitat in the Project area or the Projects impact on those species. (Dkt. No. 71, p. 14).[3]  The Plaintiffs point to the management indicator species ("MIS") of the: marten, pileated woodpecker, northern goshawk; and the sensitive species of the: black-backed woodpecker, flammulated owl, northern goshawk, and fisher.  Plaintiffs maintain there are no surveys for many of the species and the surveys that do exist are lacking. (Dkt. No. 71, pp. 17-19).  In sum, Plaintiffs assert that in "spite of the fact that the Forest Service really doesn't know the viability of species...the FS boldly asserts that Project implementation may adversely impact some of these species, 'but will not likely contribute towards Federal listing or cause a loss of viability to the population species." (Dkt. No. 71, p. 18).  The USFS counters that it fully analyzed the potential impact on species in the Project area and argues its habitat models are based on published scientific studies regarding the habitat needs for the species concerned. (Dkt. No. 73, p. 24-25).  The Court finds the USFS has properly satisfied the IPNF Plan requirements for maintaining species population levels and the NFMA's monitoring requirement of indicator species.

---

[3]  Plaintiffs also again challenge that the habitat has been repeatedly logged for the past 30 years resulting and questioning how further logging would benefit the species. (Dkt. No. 71, p. 16-17).  In considering this argument again, the Court notes the purpose of the Project is to create a more historic and, in the long term, sustainable old growth habitat by means of certain treatments within old growth stands.  Though the Plaintiffs may ultimately disagree with the USFS' chosen management method, the USFS has not acted arbitrarily or capriciously in reaching its decision.  As detailed in the record and discussed in this opinion, as well as the en banc decision, the USFS has reasonably considered and relied upon appropriate scientific data in reaching its decision as to how to manage the old growth in the Project area.  This record amply demonstrates the USFS has satisfied the IPNF Plan and NFMA's requirements regarding species and their habitat.  Moreover, the Court concludes that the USFS has discussed the quality and quantity of habitat necessary to support the species and demonstrated that its method for method for measuring the existing amount of habitat are reasonably reliable and accurate.  Lands Council, 537 F.3d at 998-999 (citation omitted).

MEMORANDUM ORDER - 30

1.      Flammulated Owl

The Ninth Circuit's en banc decision considered, at the preliminary injunction stage, the USFS' conclusions regarding the Project's impact on the flammulated owl to be reliable and supported by the USFS' on-the-ground analysis. Lands Council, 537 F.3d at 994. This Court's review on this motion finds similarly.  The SFEIS demonstrates that the USFS considered the Project's impact on the flammulated owl. (AR 00153, SFEIS, pp. 2899-2900). This consideration was based on reliable and sound science. (AR 00233, p. 5218; 00239, p. 5244). The Project's activities are designed to, in the long run, maintain and improve the species' viability and improve its preferred old growth habitat. (AR 00233; 00239).

The Plaintiffs challenge the reliability of the USFS' site specific surveys on the basis that some of the field surveys revealed that there were no flammulated owls observed. (Dkt. No. 71, p. 15); (AR 00153, SFEIS, p. 2819; 00190, 00191, 00192, 00194). The surveys cited by the Plaintiffs, however, were for the years 1993, 1997-2000, and 2003. The USFS' updated field studies, however, verified the existence of some capable flammulated owl habitat in the Project area. (AR 00153, SFEIS, p. 2896). The Court finds the USFS did not act arbitrarily or capriciously in updating its field studies which are reliable and timely. Based on the updated information, the USFS properly discuss the species' habitat and the Project's impact on that habitat. Further, SFEIS concluded the Project will preserve the necessary habitat and, in the long run, improve the habitat.

2.      Other Species

Plaintiffs challenge the surveys for the northern goshawk as "minimal" and "spotty." (Dkt. No. 71, p. 18).  The surveys, Plaintiffs note, were conducted in 1998, 2002-04, and in 2006.  The surveys located no goshawks until one was detected in 2004 and only a "very limited presence" was found in 2006.  (Dkt. No. 71, p. 18) (AR 00195, pp. 4161, 4172, 4175, 4177-79, 4181, 4184, 4198, 4205; 00196, pp. 4214-16).  Having reviewed the record in this case, the Court finds the habitat models relied on by the USFS are based on published scientific materials supporting their conclusions regarding goshawk habitat.  (AR 00233, p. 5217; 00153, SFEIS, pp. 2902-06).  The SFEIS analyzed the condition of the capable goshawk habitat in the Project area before and after the Project actions.  (AR 00153, SFEIS, pp. 2902-06).

Plaintiffs argue there are no surveys in the administrative record for the black-backed woodpecker, pileated woodpecker, fisher, or marten.  (Dkt. No. 71, p. 18).  The SFEIS discussed and examined the black-backed woodpecker's habitat including the impact of snags and concluded that there would be sufficient numbers of snags to maintain the population.  (AR 00153, SFEIS, pp. 2893-94).  The USFS considered snag habitat and concluded that any reduction in snags as a result of the Project's treatments would be "offset by insect induced tree mortality."  The USFS' conclusion that the black-backed woodpecker would remain viable is further based on reliable scientific literature.  (AR 00153, SFEIS, pp. 2706, 2818-2822, 2894-96).

MEMORANDUM ORDER - 32

As to the fisher, the USFS concludes that "a management strategy to restore more open grown historic conditions 'may temporarily reduce fisher habitat at the local scale, habitat should improve for this species with time and should be maintained on a landscape scale." (Dkt. No. 73, p. 27). This is supported by scientific material discussed in the SFEIS. (AR 00153, SFEIS, pp. 2908, 2910). The SFEIS acknowledged that fishers are currently rare but concluded that "this management strategy may temporarily reduce fisher habitat at the local scale, habitat should improve for this species with time and should be maintained on the landscape scale." (AR 00153, SFEIS, pp. 2821, 2910). The USFS further field verified the fisher habitat and disclosed that the partial harvests proposed by the Project would include fisher habitat but that the harvests would not be on significant habitat. (AR 00153, SFEIS, p. 2908).

Plaintiffs also argue the Project will adversely impact the pileated woodpecker, a MIS, by logging 1,487 acres of suitable habitat resulting in "a minor immediate effect" on its habitat. (Dkt. No. 71, p. 11). USFS argues it properly considered reliable material in arriving at this conclusion and the SFEIS discussed the impact the chosen alternative would have on the species. (Dkt. No. 73, p. 28). The Court finds the USFS did not act arbitrarily or capriciously. The SFEIS concludes that the Project will potentially reduce habitat in the short term but that adjacent locations provide suitable feeding habitat and the long term result of the Project would be increased suitable habitat. (AR 00153, SFEIS, pp. 2913-17). The SFEIS noted that the pileated woodpecker habitat includes a variety of forested habitat, not just old growth. (AR 00153, SFEIS, pp. 2822, 2913). Ultimately, the SFEIS concludes the pileated

woodpecker remains viable within the IPNF under the Project.  This conclusion, the Court finds, is supported by reliable scientific materials.  (AR 00153, SFEIS, p. 2917).  Finally, the USFS argues the cumulative impacts to boreal toads are addressed in the SFEIS.  (Dkt. No. 73, p. 27).  The Court agrees that the SFEIS adequately discusses the habitat of this species. (AR 00153, SFEIS, pp. 2821, 2910-12).

       E.       <u>Conclusion</u>

Here, the USFS properly relied upon the two databases, and other materials, in estimating the old growth in the IPNF to be at least 10 percent.  The USFS used updated data from site specific monitoring of the species in the Project area and properly satisfied the IPNF Plan requirements for maintaining species population levels and the NFMA monitoring requirement for indicator species.  Upon these bases the USFS discussed, analyzed, and considered the Projects impact on the species in the SFEIS.  Having done so, the USFS concluded the Project was in compliance with the IPNF Plan requirements for maintaining old growth dependent species' population levels and the NFMA's monitoring requirements for indicator species.  The Court finds this decision is well supported in the record and is afforded an appropriate amount of deference.  "Granting the Forest Service the latitude to decide how best to demonstrate that its plans will provide for wildlife viability comports with our reluctance to require an agency to show us, by any particular means, that it has met the requirements of the NFMA every time it proposes action." <u>Lands Council</u>, 537 F.3d at 992. "[W]e defer to the Forest Service as to what evidence is, or is not, necessary to support wildlife viability analyses. Were we to grant less deference to the agency, we would be

ignoring the APA's arbitrary and capricious standard of review." Id. Having reviewed the record here, the Court finds the USFS' decision and reliance on its site specific monitoring was not arbitrary or capricious.

### ORDER

Based on the foregoing and being fully advised in the premises, the Court **DENIES** the Plaintiffs' motion for summary judgment (Dkt. No. 71). The Defendants' and Defendant-Intervenors' cross-motions for summary judgment (Dkt. Nos. 73, 76) are **GRANTED**.

IT IS FURTHER ORDERED that this case is **DISMISSED** in its entirety.

DATED:  **September 30, 2009**

Honorable Edward J. Lodge
U. S. District Judge

MEMORANDUM ORDER - 35